UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:05-CR-23 |
| | ) | (PHILLIPS/SHIRLEY) |
| ROBERT D. CAMPBELL, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT & RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This matter comes before the Court upon Defendant's Motion to Suppress [Doc. 45], which was filed on July 20, 2006, and defendant's Second Motion to Suppress [Doc. 55], which was filed on August 29, 2006. The parties came before the Court for a suppression hearing on September 1, 2006. The government was represented by Assistant United States Attorney Steven H. Cook, and Defendant was represented by Charles Poole. At the conclusion of the hearing, the Court took the motion and related filings under advisement.

Defendant is charged in a three-count Superseding Indictment [Doc. 53] alleging that on February 16, 2005, Defendant, having previously been convicted of a felony, possessed a firearm (count one), possessed crack cocaine with intent to distribute (count two), and used and carried a firearm during and in relation to a drug trafficking crime (count three). Defendant argues that he was unlawfully seized in violation of his Fourth Amendment rights on February 16, 2005, and that

the subsequent search was therefore unconstitutional. [Docs. 45 and 55]. The government opposes Defendant's motion, arguing that the arrest was lawful and that the evidence obtained incident to that arrest and the statements made subsequent thereto were lawfully obtained. [Docs. 51 and 57].

## I.   SUMMARY OF TESTIMONY

### a.   Testimony of Investigator Kenneth Todd Gilreath

At the suppression hearing, the government presented the testimony of Investigator Kenneth Todd Gilreath of the Knoxville Police Department ("KPD"). Investigator Gilreath testified that in February, 2005, he was a Knoxville Organized Crime Unit Investigator assigned to the FBI Violent Crime Task Force. He testified that he had been an officer with KPD since 1993. Investigator Gilreath testified that after spending his first year undercover, he was assigned to the patrol division for four or five years. He testified that during that time, he was assigned primarily to East Knoxville and in particular to the Walter P. Taylor Housing Development, where he spent the majority of his time on foot patrol. Investigator Gilreath also indicated that he was familiar with the "Short East" area, and further indicated that the "Short East" area included the intersection of South Harrison Street and Wilson Avenue.

Investigator Gilreath testified that he has extensive experience and training in dealing with gambling and drug related crimes. Investigator Gilreath stated that he has been involved in over fifty gambling related and over one-hundred drug related investigations, has executed over fifty gambling related and over one-hundred drug related search warrants, and has debriefed between fifty and one-hundred individuals involved in gambling related activity and over one-hundred individuals involved in drug related activity. Investigator Gilreath indicated that he has received specialized

training in dealing with gambling and drug related crimes, and that he is familiar with the methods of operation of both gambling organizations and drug organizations.

Investigator Gilreath indicated that, based upon his experience, gambling organizations are commonly located in East Knoxville and that the gambling organizations commonly use both the sale of drugs and illegal gambling to help fund operations. Investigator Gilreath described the "typical" organized gambling operation of consisting of about four main individuals who establish a central base of operations in a house or business. Investigator Gilreath stated that the organizations use runners to help carry money and bets back and forth between the central base of operations and areas where the actual gambling activity occurs. Investigator Gilreath indicated that the actual gambling activity usually consists of an illegal lottery, with the winning numbers usually based upon the numbers in some legitimate lottery. Investigator Gilreath noted that Wednesday and Sunday nights are the busiest nights for organized gambling operations, because those are nights when legitimate lotteries, such as Powerball, hold drawings.

Investigator Gilreath next stated that it would be common for an organized gambling operation to have thousands of dollars in cash on hand on those nights. Investigator Gilreath testified that, because of the high concentration of cash in what is usually a high crime area, organized gambling operations are often subject to robbery by other criminals. Investigator Gilreath indicated that organized gambling operations commonly use lookouts to help protect against robbery, and also to help protect against police detection of illegal activity. Investigator Gilreath also noted that some organized gambling operations make use of video cameras to help protect against unwanted intruders, but that the cost and difficulty in quickly moving a network of video cameras makes the use of cameras far less common.

Investigator Gilreath then went on to describe 507 South Harrison Street ("Max's"). Investigator Gilreath noted that he is very familiar with that area of town, and that it is definitely a high crime area. Investigator Gilreath indicated that there have been multiple shootings in that area, and that a bail bondsman was murdered at the intersection of South Harrison and Wilson. Investigator Gilreath also indicated that the KPD had received a number of complaints about frequent criminal activity in the area, including reports of prostitution, gun fire, drug related activity, and other crimes. Investigator Gilreath described the area around Max's as a hub of criminal activity.

In describing the investigation of Max's, Investigator Gilreath stated that the KPD had made use of both informants and long term surveillance. Investigator Gilreath noted that the ongoing investigation had revealed that Max's was the main source for a "numbers operation," that drug sales had occurred on and around the premises, and that prostitutes, gang members, drug dealers, and convicted felons were known to frequent the establishment. Investigator Gilreath also testified that Max's was set-up as a pub/deli and that alcohol was served at the establishment, but Max's did not have a beer or liquor license. Investigator Gilreath also noted that the fire marshal did not have an occupancy rating for Max's, but that Investigator Gilreath expected to find around forty individuals inside Max's when the task force executed the search warrant.

Investigator Gilreath then went on to describe the planning and preparation leading up to the February 16, 2005, raid. Investigator Gilreath indicated that he obtained a search warrant from Judge Liebowitz. Investigator Gilreath also indicated that he prepared the plan for the raid [Def. Ex. 5], and held a safety briefing prior to the raid. Investigator Gilreath testified that the safety briefing consisted of Investigator Gilreath describing the facts and circumstances leading up

4

to the raid, the plan for the raid, and assigning responsibilities to the various participants. Investigator Gilreath noted that he also ensured that, because of the history of violent crime in the area and the presence of known gang members and convicted felons, every participant in the raid would be wearing body armor and clear identification as law enforcement officers.

Investigator Gilreath stated that the raid consisted of two groups. Investigator Gilreath indicated that the first group consisted of the officers and agents who would enter Max's, and the second group consisted of the officers and agents who would establish a perimeter around Max's. Investigator Gilreath testified that he led the first group, and that the first group consisted of about seventeen people. Investigator Gilreath noted that the KPD patrol division assisted with the second group. Investigator Gilreath stated that the task force approached Max's in a caravan of both marked and unmarked vehicles. Investigator Gilreath indicated that the first three vehicles were all marked vehicles, and that these vehicles would take up positions at the intersections around Max's to stop traffic. Investigator Gilreath noted that he was in the fourth vehicle, which was unmarked, and that there were approximately six or seven other unmarked vehicles behind him. Investigator Gilreath stated that he had made sure that each vehicle would contain at least one person equipped with a KPD radio, so that the task force could maintain communications. Investigator Gilreath indicated that the raid participants were armed with hand guns, though one officer did have a shotgun.

Investigator Gilreath indicated that the task force arrived at Max's at about 7:00 p.m. on Wednesday, February 16, 2005. Investigator Gilreath noted that they selected Wednesday night because Wednesdays are one of the two busiest nights for organized gambling operations and executing the warrant on a Wednesday night would allow the officers to maximize the effectiveness

of the raid. Investigator Gilreath also noted that the raid occurred on a dark, cold, breezy February night. Investigator Gilreath indicated that it was not the type of weather one would casually stand around in.

Investigator Gilreath stated that his vehicle was the first to pull into Max's parking lot, and that he was "moving with a purpose" when he pulled into the parking lot. In clarifying, Investigator Gilreath indicated that the caravan was moving as quickly as they could while still maintaining a safe speed. Investigator Gilreath testified that, as he was pulling into Max's, he observed several vehicles in the parking lot, and that the hood of one of the vehicles was raised and an individual appeared to be working on the engine. Investigator Gilreath stated that he also observed an individual (who was later identified as defendant Campbell) standing in the doorway of Max's, that the individual in the doorway looked at Investigator Gilreath, and that the individual then rapidly came off the porch of Max's. Investigator Gilreath indicated that he announced over the radio "got one running," or something to that effect.

Investigator Gilreath noted that there was a distance of between thirty and forty-five feet between Investigator Gilreath, who was still in his unmarked car, and Defendant. Investigator Gilreath testified that he did not immediately recognize the person standing on the porch as Defendant, but that at some unidentified later point in time Investigator Gilreath did recognize Defendant from an encounter which occurred approximately nine years earlier. Investigator Gilreath stated that he did not observe Defendant exiting the interior of Max's, but instead clearly saw him standing in the threshold of the door and then moving off the porch into the grass in front of the porch. Inspector Gilreath noted that Defendant did not use the stairs as he was coming off the porch and did not use the sidewalk. Inspector Gilreath also indicated that Defendant was not moving at

6

an all out run, but was moving sufficiently fast to cause Inspector Gilreath to send out over the radio that there was a runner. Inspector Gilreath drew an "RC" in black ink on Government's Exhibit 1 to indicate Defendant's starting point and a line in black ink to indicate Defendant's path. [Gov. Ex. 1].

Investigator Gilreath went on to state that he believed Defendant was acting as a lookout for Max's in order to help protect Max's from robbery and to provide a warning if the police approached. Investigator Gilreath indicated two factors which led him to believe that Defendant was acting as a lookout: 1) it was very cold out and Defendant was not smoking or speaking with anyone, and did not appear to have any reason to be standing around outside other than to serve as a lookout; 2) Defendant was wearing a puffy coat,[1] as if he were going to be staying outside for an extended period of time.

Investigator Gilreath testified that, rather than chasing Defendant, the Investigator proceeded inside Max's. Investigator Gilreath stated that he was responsible for taking care of activity inside the building, and that other officers would handle anything going on outside. Investigator Gilreath indicated that, upon entering Max's, his initial observations were that several individuals were moving towards the bathroom, there was marijuana smoke in the air, large amounts of cash were on the tables, and quantities of marijuana and cocaine were hitting the floor.[2] The Court limited Investigator Gilreath's testimony as to what he observed upon entering Max's, because that time period would coincide with the events leading up to Defendant's detention outside.

---

[1]Investigator Gilreath indicated that puffy coats are often used to conceal weaponry.

[2]Investigator Gilreath testified that individuals commonly try to dispose of illegal substances during a raid by throwing the illegal substance to the ground.

On cross-examination, Investigator Gilreath was shown video footage from Officer Gentry's police cruiser, the third vehicle in the caravan. The video showed two marked police cars preceding the camera driving westbound on Wilson Avenue. The video showed the two police cars continuing past Max's on Wilson, while the vehicle with the camera turned left to head southbound on South Harrison Street. While the vehicle was turning from Wilson Avenue onto South Harrison Street, the camera panned across Max's, providing a very brief glimpse of the front porch and parking lot of Max's. The timestamp on the video footage showing Max's was approximately 18:57:44. The video footage revealed one individual in front of what appeared to be a white Cadillac in Max's parking lot and what appeared to be two individuals in front of Max's.

Defense Counsel next read from the narrative of the General Sessions Complaints filed against Defendant, sworn out by Officer Jim Claiborne, which indicated that

> [t]he defendant was observed exiting[3] a business located at 507 S. Harrison Street known as Max's Lounge. A search warrant was being executed at this business. The defendant was detained and placed on the ground. When officers requested the defendant to place his hands behind his back, the defendant told the affiant that he had a gun in his waist band.

[Def. Ex. 3 and 4]. Investigator Gilreath again indicated that, upon pulling into Max's parking lot, he saw Defendant on the porch of Max's in the threshold of the entryway. Investigator Gilreath stated that he saw Defendant come off the porch, but he did not see Defendant go inside Max's, did not hear Defendant shout a warning inside, or otherwise see Defendant turn towards the interior of Max's as if to speak to someone inside. However, Investigator Gilreath also testified that Defendant would have only needed an instant to warn the individuals inside Max's, and, because Investigator

---

[3]Officer Claiborne later testified at the hearing that he considered leaving the porch of Max's to be "exiting" the business.

Gilreath's car was the fourth in the caravan, there was no way for Investigator Gilreath to know what Defendant did before Investigator Gilreath pulled into Max's parking lot and Investigator Gilreath actually saw Defendant.

When asked about what type of people lived in the neighborhood around Max's, Investigator Gilreath indicated that there were nice people who lived in the area, and that it was these nice people who often complained about the illegal activity occurring in and around Max's. Investigator Gilreath agreed that not everyone in the neighborhood was a criminal, but he disagreed with the statement that ordinary, law abiding citizens might frequent Max's. Investigator Gilreath indicated that most people in the neighborhood would know that Max's was a center for criminal activity and that law abiding citizens would not want to patronize such an establishment.

Investigator Gilreath noted that he, himself, did not arrest anyone that night and that he did not know if anyone else was arrested. Investigator Gilreath indicated that Mr. Gillespie, one of the individuals running Max's, was cited, and that Max's was shut down. Investigator Gilreath indicated that the goal of the raid was to "catch and clean," meaning that the officers were primarily concerned with seizing the illegal drugs to get them off the streets. Investigator Gilreath again noted that the individuals inside Max's carrying illegal substances dropped them on the ground as law enforcement was entering the building, making it difficult to know which individuals might have possessed which illegal substances. Investigator Gilreath testified that the individuals inside Max's were patted down and checked for outstanding warrants.

When asked whether it was unusual for someone, like Defendant, when faced with all of the police activity occurring outside Max's, to see all this and walk away, Investigator Gilreath replied that Defendant did not "walk away." Investigator Gilreath again indicated that he felt

Defendant was trying to run, and that was why Investigator Gilreath sent out the warning on the radio that there was a runner.

When asked whether the raid plan indicated how the police would deal with individuals outside Max's, Investigator Gilreath indicated that it did not. [Def. Ex. 5]. However, Investigator Gilreath stated that he knew everyone on the raid was an experienced law enforcement officer, and that Investigator Gilreath did not feel it was necessary to explain basic law enforcement procedure to the members of the raid. Instead, Investigator Gilreath indicated that he was certain that each raid member would handle any suspects in a manner consistent with the training and guidelines of their respective law enforcement agencies.

In describing the exterior of Max's, Investigator Gilreath noted that the brown wooden object shown on the left side of Max's in Government's Exhibit 2A was the exterior door, which was propped open. Investigator Gilreath further noted that there is a short hallway connecting the exterior door and the interior door visible in the photograph, and that it was on the threshold of that short hallway that Investigator Gilreath saw Defendant standing.

**b.** **Investigator James Clayton Claiborne**

The government next called James Clayton Claiborne, an Investigator with KPD. Investigator Claiborne indicated that he has been with the KPD for twenty-seven years, and currently works with the ATF Task Force. Investigator Claiborne testified that he investigates gun cases and helps to prepare them for federal prosecution. Investigator Claiborne has been with the ATF Task Force for eleven years.

Investigator Claiborne indicated that, on the night of February 16, 2005, Investigator Claiborne was assisting Investigator Gilreath with the execution of the search warrant on Max's.

Investigator Claiborne stated that he was assigned to "containment and security," and was in the third or fourth car behind Investigator Gilreath. Investigator Claiborne testified that, as the caravan was pulling into Max's, he heard Investigator Gilreath announce over the radio that "I've got one running off the porch." Investigator Claiborne stated that he pulled into the corner of Max's parking lot and that Investigator Gilreath's car was in front of him, closer to Max's. Investigator Claiborne indicated the positions of the two cars on Government's Exhibit 1, marking Investigator Claiborne's car with a "C" and Investigator Gilreath's car with a "G."

Investigator Claiborne stated that he saw Defendant coming down off the edge of the porch and moving toward the tree.[4] Investigator Claiborne sketched Defendant's path as a blue dotted line. [Gov. Ex. 1]. Investigator Claiborne noted that two other police vehicles had pulled up on the side of South Harrison Street, slightly to the south of Max's, near the tree. Investigator Claiborne testified that law enforcement agents were confronting another individual by the tree, and that Defendant turned to the north, as if to avoid the police. Investigator Claiborne stated that Lieutenant Hobbs, who was near the tree, asked for someone to check Defendant.

Investigator Claiborne indicated that he and Agent Moore were near Defendant by that time, and Investigator Claiborne thought that Defendant was trying to avoid the police, so Investigator Claiborne, concerned about the safety of everyone on the scene, ordered Defendant to get on the ground and place his hands on his head. Investigator Claiborne testified that, as Defendant was getting on the ground and placing his hands on his head, Defendant said that he had a gun in his waistband. Investigator Claiborne indicated that he then handcuffed and frisked Defendant and located a loaded .357 Smith and Wesson in Defendant's waistband and a small

---

[4]The tree is indicated on the map by a brownish circle in front of Max's. [Gov. Ex 1].

quantity of crack cocaine. Investigator Claiborne stated that he then placed Defendant under arrest and placed Defendant in the back of Officer Gentry's patrol car.

Investigator Claiborne indicated that Defendant was then taken to the Organized Crime Unit interview room at the police department, where Investigator Claiborne got Defendant something to drink and Defendant was allowed to smoke a cigarette. Investigator Claiborne testified that he, Agent Moore, and Officer Gentry were present for the interview, and that, prior to starting the interview , Investigator Claiborne read Defendant his Miranda rights and asked Defendant to initial each right on a Statement of Rights. [Gov. Ex. 3]. Investigator Claiborne stated that Defendant said he understood the rights, agreed to talk to the officers, and signed a Waiver of Rights [Gov. Ex. 3].

Investigator Claiborne noted that the initial portion of the interview, the portion where the events leading to Defendant's arrest were discussed, was video taped [Gov. Ex. 4], but that the video tape was then turned off. Investigator Claiborne indicated that it is his standard operating procedure to turn off the video tape after discussing the events leading up to a defendant's arrest, so that the officers and defendant can freely discuss the possibility of the defendant becoming an informant without creating a risk of the video tape falling into the wrong hands and endangering the potential informant. Investigator Claiborne indicated that, in this instance, they did not discuss the possibility of Defendant becoming an informant. Investigator Claiborne indicated that Defendant was arrested at approximately 7:00 p.m. and the Statement and Waiver of Rights was executed at 8:05 p.m. Investigator Claiborne further stated that Defendant was not deprived of food or water; was not threatened, coerced, or beaten; and did not receive any promises of special treatment.

On cross-examination, Investigator Claiborne was shown a photo of the exterior of Max's taken July 26, 2006. [Def. Ex. 6]. The photo shows a wooden fence, which was not present on February 16, 2005, and was taken during the day, but otherwise the scene is depicted as it was on February 16, 2005. Investigator Claiborne drew a blue "X" to indicate where he initially observed Defendant, and a blue line to indicate Defendant's path as he left Max's porch. [Def. Ex. 6]. Investigator Claiborne was then asked to indicate on Government's Exhibit 1 where the police cars stopped on South Harrison Street. Investigator Claiborne indicated that he was not sure exactly where the cars stopped, only that he believed there were two cars and that they were slightly south of Max's. Investigator Claiborne drew two blue rectangles on South Harrison Street to indicate a rough estimate of where the cars stopped. [Gov. Ex. 1]. Investigator Claiborne further indicated that he believed that the officers who had encountered the other individual at the tree were uniformed officers.

Investigator Claiborne then indicated that, before stopping Defendant, Investigator Claiborne did not see Defendant commit a crime, and that the only reason why Investigator Claiborne stopped Defendant was because Investigator Claiborne thought Defendant was trying to avoid the police. Investigator Claiborne also indicated that there was a canine officer behind Max's, and that if Defendant had heard the canine, then Defendant would have known that he could not flee in that direction.[5] Investigator Claiborne was then asked about the General Sessions Complaints which stated that Defendant was seen "exiting" Max's. [Def. Ex. 3 and 4]. Investigator Claiborne

---

[5]Investigator Claiborne indicated that police dogs are trained to bark loudly and repeatedly to help increase their deterrent effect. However, Investigator Claiborne indicated that he did not know if Defendant knew there was a canine unit in place.

indicated that he was the one who filed out the Complaints, and that he considered coming off the porch to be exiting the business.

Investigator Claiborne indicated that he did not know if anyone else was searched, nor did he know if the individual who had been detained by the tree had been placed on the ground. Investigator Claiborne stated that Defendant had made it close to the sidewalk bordering South Harrison Street, but was not all the way there. Investigator Claiborne estimated that Defendant had made it to within about fifteen feet of the sidewalk bordering on South Harrison Street. Investigator Claiborne testified that he made it from the point where Investigator Claiborne stopped his car to Defendant's position in about two seconds.

On re-direct, Investigator Claiborne again indicated that Defendant first moved away from the entrance of Max's, where Investigator Gilreath was heading, toward the tree. Investigator Claiborne then noted that, as the police pulled up and detained an individual by the tree, Defendant again turned to move away from the police. Investigator Claiborne indicated that there were no escape routes left to Defendant, that Investigator Claiborne closed off the only remaining avenue of escape.

### c.      Stewart Sullivan Branner

Defendant called Stewart Sullivan Branner. Mr. Branner indicated that he is thirty-six years old and has never been convicted of a felony. Mr. Branner testified that he has known Defendant for ten to fifteen years, but that, prior to the hearing, he had not seen Defendant since February 16, 2005. Mr. Branner noted that he went to Max's on February 16, 2005 to see some friends from the neighborhood. Mr. Branner stated that he lived in the neighborhood around Max's and that he went to Max's quite often.

Mr. Branner testified that, at the time of the raid, Mr. Branner was standing in front of Max's on the sidewalk running between the front door of Max's and South Harrison Street. Mr. Branner indicated his position on Defendant's Exhibit 6 with a red "S". Mr. Branner stated that Defendant was standing nearby, indicating Defendant's position on the photo with a red "C." [Def. Ex. 6]. Mr. Branner said that the police cars caught his attention and startled him. Mr. Branner stated that he looked at the police vehicles, and was then told to get on the ground by plain clothes officers. Mr. Branner indicated where he got on the ground with a red "SB." [Def. Ex. 6].

Mr. Branner testified that Defendant was on the ground on the other side of the sidewalk. Mr. Branner indicated that he did not see Defendant walk toward the tree or toward the parking lot, claiming that they did not have time to react before the police arrived. Mr. Branner stated that he did not know if Defendant said anything while he was on the ground, and that Mr. Branner was on the ground for one or two minutes before the police officers stood Mr. Branner and continued to search him. Mr. Branner also indicated that he had a small baggie of marijuana on him at the time of the raid, which the police found. Mr. Branner stated that he was placed in the back of a police cruiser, and that Mr. Branner saw Defendant being placed in the back of a different police cruiser. Mr. Branner stated that he was cited for possession, but was not taken into custody. Mr. Branner testified that he later pled guilty to simple possession in General Sessions Court.

On cross-examination, Mr. Branner indicated that he was currently unemployed and lived at 3341 Sunset Avenue. Mr Banner indicated that the events of February 16, 2005 were very hectic, and that his attention was drawn to the patrol cars and then to the police officers coming towards him. Mr. Branner noted that, because his attention was focused on the cruisers and the

police, his back was to Max's.  Mr. Branner testified that he has been arrested by KPD before for a DUI.

When asked whether there was a lot of crime in the area around Max's, Mr. Branner indicated that there is lots of crime everywhere.  Mr Banner stated that he did know there had been two murders at the intersection of South Harrison Street and Wilson Avenue.  However, Mr. Branner indicated that he did not believe there was a higher concentration of gang activity in the area around Max's, but that gang activity was found all over Knoxville.

Mr. Branner noted that there were four officers dealing with him, and that the police cruisers were located down the street.  Mr. Branner indicated that Mr. Branner and Defendant were approached by a lot of officers and that the officers were running.  Mr. Branner testified that he had not been smoking marijuana before the events in question on February 16, 2005.  Mr. Branner indicated that, at the time of the raid, he and Defendant were standing on the walkway right outside the front door to Max's, not the sidewalk bordering on South Harrison Street.

## II.    FINDINGS OF FACT

The Court finds that, around 7:00 p.m. on February 16, 2005, Investigator Todd Gilreath and other members of various law enforcement agencies conducted a raid on Max's, located at 507 South Harrison Street, in order to execute a search warrant.  Max's is located in a high crime area and is known to be frequented by gang members, drug dealers, convicted felons, and other dangerous individuals.  The members of the raid traveled to Max's by driving westbound on Wilson Avenue in a caravan of marked and unmarked law enforcement vehicles.  The first three vehicles in the caravan were marked police cruisers, and these vehicles took up positions around the perimeter of Max's to help control traffic.  Investigator Gilreath was in the fourth vehicle, which was

unmarked. Investigator Claiborne was in the seventh or eighth vehicle in the caravan. Investigator Gilreath's vehicle was the first vehicle to pull into Max's parking lot, and it did so very quickly.

Upon arriving, Investigator Gilreath saw Defendant standing in the threshold of the front doorway of Max's. Investigator Gilreath did not recognize Defendant as a convicted felon at this time, instead only remembering his previous encounter with Defendant sometime after the events of February 16, 2005. Defendant and Investigator Gilreath looked at each other, and then Defendant began to move out of the doorway and off the porch. Defendant was not moving at an all out run, but was moving quickly. Investigator Gilreath observed Defendant moving off the porch and announced over the radio "I've got one running." Investigator Gilreath proceeded to enter Max's, leaving other officers to handle Defendant. Upon first entering Max's, Investigator Gilreath observed several individuals moving towards the bathroom, large sums of cash on the tables, quantities of crack and marijuana being thrown onto the ground, and detected the presence of marijuana smoke in the air. These observations were made in the period of time immediately before Defendant was detained.

As Investigator Gilreath was announcing "I've got one running" over the radio, Investigator Claiborne was pulling in to Max's parking lot. Investigator Claiborne heard Investigator Gilreath's radio announcement and observed Defendant coming off Max's porch. Investigator Claiborne began to move toward Defendant. Investigator Claiborne was accompanied by Agent Moore.

Meanwhile, Defendant, continued moving off the porch, exiting from the side of the porch rather than going down the stairs. Defendant descended to the grass beside Max's porch and then proceeded to head southeast from the porch towards the tree in front of Max's. While

Defendant was coming off the porch and moving toward the tree, two patrol cars had pulled up on South Harrison Street, to the south of Max's. The officers from the two patrol cars were confronting Mr. Branner near the tree. Defendant observed the officers confronting Mr. Branner, turned northeast, and continued moving. Lieutenant Hobbs, who was near the tree, observed Defendant moving to the northeast and said "check him."

Investigator Claiborne heard Lt. Hobbs order for someone to check Defendant, so Investigator Claiborne approached Defendant and ordered Defendant to get on the ground and to place his hands on his head. As Defendant was getting on the ground, Defendant announced "I've got a gun in my waistband." Investigator Claiborne then handcuffed and frisked Defendant, discovering a loaded .357 Smith and Wesson handgun and a small quantity of crack in Defendant's jacket pocket. Investigator Claiborne then arrested Defendant and placed him in the back of a patrol car. Defendant was placed under arrest at approximately 7:00 p.m.

While Investigator Claiborne was dealing with Defendant, Mr. Branner had also been asked to get on the ground under the tree and had also been frisked. The officers investigating Mr. Branner discovered a small baggie of marijuana, and Mr. Branner was placed in the back of a different patrol car. Mr. Branner was cited for simple possession and released.

Defendant was taken to an interview room located in the KPD Organized Crime Unit. Defendant was given an opportunity to smoke a cigarette and was given a bottle of water. Defendant was read his rights. Defendant indicated that he understood each right. Defendant was given a form titled "Statement of Your Rights" and "Waiver of Rights." Defendant read the form, initialed each right, indicating that he understood the rights, and signed the waiver at 8:05 p.m.

Defendant was not threatened, coerced, beaten, or promised any preferential treatment during the interview process.

### III.    POSITIONS OF THE PARTIES

Defendant argues that Investigators Gilreath and Claiborne had neither probable cause, nor a reasonable and articulable suspicion that Defendant had committed, was committing, or was about to commit a crime, or that Defendant was armed or dangerous prior to stopping Defendant on February 16, 2005. Defendant claims that the police had nothing more than a hunch that Defendant might be committing a crime, and that a hunch is not a sufficient basis for a stop. Therefore, because the police did not have sufficient grounds to stop Defendant, Defendant argues that the evidence obtained as a result of that stop should be suppressed. Defendant further argues that the video tape footage from Officer Gentry's patrol car indicates that Defendant was not on the porch of Max's, but was instead on or near the sidewalk in front of Max's, near Mr. Branner and that, as per Mr. Branner's testimony, Defendant made no attempt to avoid the police, but merely stood there as the police arrived.

The government responds that the detention and subsequent arrest of Defendant were both lawful and that the evidence and statements obtained incident to the detention and arrest were lawfully obtained. The government contends that Investigators Gilreath and Claiborne had reasonable suspicion  sufficient to support a stop and frisk of Defendant for the following three reasons: (1) Defendant was in a high crime area; (2) Defendant took evasive action as the police approached; (3) Defendant was in close proximity to an area where police knew crimes were being committed and where a search warrant was being executed.

## IV.    ANALYSIS

The first issue the Court must address is whether Investigators Gilreath and Claiborne properly stopped Defendant on February 16, 2005.  It is the government's contention that the Investigators had reasonable suspicion to the stop Defendant based upon the Investigators' observations, inferences and deductions that: (1) Defendant was in a high crime area; (2) Defendant took evasive action as the police approached; (3) Defendant was in close proximity to an area where police knew crimes were being committed and where a search warrant was being executed; (4) Defendant was serving as a lookout for the criminal activity occurring inside Max's.

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend. IV.  However, a temporary seizure under the Fourth Amendment is not unreasonable for investigative purposes, in what is referred to as a Terry stop, where the officer has a reasonable suspicion, supported by articulable facts, that criminal activity has occurred or is about to occur.  Terry v. Ohio 393 U.S. 1, 20 (1968); Farm Labor Org. Comm. v. Ohio State Highway Patrol, 308 F.3d 523, 543-44 (6th Cir. 2002).  Under Terry, the officer's reasonable suspicion permits the officer to detain the suspect while asking a moderate number of questions to identify the suspect and either confirm or dispel the officer's suspicions.  United States v. Martin, 289 F.3d 392, 398 (6th Cir. 2002).  If the suspect's answers fail to supply the officer with probable cause to arrest the suspect, then the officer must release the suspect.  Id. at 397.

Defendant argues that the officers basis for stopping him amounted to a hunch rather than reasonable suspicion and is therefore unlawful.  The Court finds that Defendant was seized when Investigator Claiborne ordered Defendant to get on the ground and place his hands behind his head and Defendant complied.  At that point, the officers had to have reasonable suspicion to detain

Defendant. Concluding that a seizure occurred, the Court must now determine, under a totality of the circumstances analysis, whether the seizure was constitutionally permissible. In other words, the Court must determine whether the officers had a reasonable suspicion, supported by articulable facts, that the defendant was engaged in criminal activity when he seized the defendant. Terry, 393 U.S. at 20; Farm Labor Org. Comm., 308 F.3d at 543-44. In evaluating the constitutionality of an investigative stop, the Court engages in a two-part analysis of the reasonableness of the stop. First, the Court asks, "whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion" of criminal activity. United States v. Garza, 10 F.3d 1241, 1245 (6th Cir. 1993).

The government contends that Investigators Gilreath and Claiborne had reasonable suspicion to seize Defendant based upon their belief that: (1) Defendant was in a high crime area; (2) Defendant took evasive action as the police approached; (3) Defendant was in close proximity to an area where police knew crimes were being committed and where a search warrant was being executed; (4) Defendant was serving as a lookout for the criminal activity occurring inside Max's. Defendant contends that the officers' observations amounted to no more than a hunch because the officers did not actually see Defendant commit any crimes, they merely saw Defendant standing in a public area, doing nothing that would provide a basis for reasonable suspicion.

Initially, the Court notes that facts innocent in and of themselves can contribute to reasonable suspicion. See United States v. Arvizu, 534 U.S. 266, 273 (2002) (holding that seemingly innocent information can provide a basis for reasonable suspicion in light of an officer's training and experience). Furthermore, even if the isolated facts and circumstances in this case could

arguably be deemed innocent, the Court does not view them in isolation. United States v. Garza, 10 F.3d 1241, 1245 (6th Cir. 1993). Instead, when reviewing a challenge to an investigative stop, the Court assesses the reasonableness of the officer's suspicion that criminal activity "may be afoot" in light of the totality of the circumstances, giving due weight to specific reasonable inferences which officers are entitled to draw from the facts. United States v. Bailey, 302 F.3d 652, 658 (6th Cir. 2002); see also United States v. Jones, 75 Fed.Appx. 334, 337-38 (6th Cir. 2003) (holding that "[o]fficers are permitted to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person"). The likelihood of criminal activity "need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." United States v. Zabawa, 134 Fed.Appx. 60, 62 (6th Cir. 2005) (quoting Arvizu, 534 U.S. at 273). In other words, there must be a "minimal level of objective justification" for making the stop. United States v. Moreno, 43 Fed.Appx. 760, 764 (6th Cir. 2002).

Furthermore, the United States Supreme Court has held that "for Fourth Amendment purposes, . . . a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." Michigan v. Summers, 452 U.S. 692, 705 (1981). The Sixth Circuit has expanded upon Summers, ruling that Summers allows officers to detain non-residents on the premises at the time of the search. United States v. Fountain, 2 F.3d 656, 660-65 (6th Cir. 1993). The Sixth Circuit has also held that Summers and Fountain authorize the police to detain those coming and going from the premises where a search warrant is being executed. United States v. Bohannon, 310 F.3d 615, 617 (6th Cir. 2000). Additionally, the United States Supreme Court has held that unprovoked flight from an

officer in a high crime area does create reasonable suspicion. Illinois v. Wardlow, 528 U.S. 119, 124-26 (2000). Numerous other courts have ruled that Wardlow does not require headlong flight. See United States v. Smith, 396 F.3d 579 (4th Cir. 2005); United States v. Hunter, 291 F.3d 1302 (11th Cir. 2002); United States v. Gordon, 231 F.3d 750 (11th Cir. 2000).

Thus, the Court finds, giving due weight to the experience and specialized training of Investigators Gilreath and Claiborne, that (1) Defendant was located in a high crime area; (2) Defendant took evasive action as the police approached; (3) Defendant was on the premises of an area where a search warrant was being executed; (4) it was reasonable for Investigators Gilreath and Claiborne to believe that Defendant was serving as a lookout for the criminal activity occurring inside Max's. Based on the foregoing, the Court finds that Investigator's Gilreath and Claiborne had reasonable suspicion to believe that Defendant could have been serving as a lookout for Max's and criminal activity was afoot. More specifically, the Court finds that Defendant's evasive actions, coupled with Defendant's proximity to Max's, provides the requisite reasonable suspicion for the officers to conduct a Terry investigation.

Accordingly, the Court finds based on the totality of the circumstances, including the information known to the officers as set forth above along with reasonable inferences that could be drawn from the cumulative information available to them at the time of the stop, that the officers had reasonable, objective suspicion to conduct a Terry investigation. Thus, Defendant's seizure was constitutionally permissible.

With regard to Defendant's argument that the video tape footage from Officer Gentry's patrol car indicates that Defendant was not on the porch of Max's, but was instead on or near the sidewalk in front of Max's, near Mr. Branner and that, as per Mr. Branner's testimony,

Defendant made no attempt to avoid the police, but merely stood there as the police arrived, the Court has already found that Defendant was located on the porch of Max's. The Court notes that Defendant did not move the video footage from Officer Gentry's car into evidence, nor has the Court even been provided a copy of the video footage. Based upon the brief opportunity the Court had to review the video footage at the hearing, the Court finds that the video footage was inconclusive as to which individuals were standing in front of Max's and where those individuals were located. The video footage simply was not clear enough to contradict the testimony of two law enforcement officers. Furthermore, the Court finds Mr. Branner's testimony to be less credible than that of the officers. Mr. Branner, as a long time friend of Defendant and as someone who, himself, was breaking the law while present at Max's, combined with Mr. Branner's own admission that he was focusing on the police activity around him, simply is not as reliable a witness as the two officers.

Having concluded that the basis for the investigative stop was proper, the Court must next determine whether the detention was reasonable, that is, (1) was it sufficiently time limited, and (2) were the investigative means used the least intrusive means reasonably available." Bennett v. City of Eastpointe, 410 F.3d 810, 825-26 (6th Cir. 2005) (internal quotation marks and citation omitted). Defendant contends that Investigator Claiborne did not have the requisite reasonable suspicion to order Defendant to get down on the ground car or to frisk him. He argues that Investigator Claiborne's suspicion that Defendant was trying to avoid the police did not support that degree of intrusion. The government contends that Investigator Claiborne had specific and articulable facts causing him to believe Defendant could be armed and dangerous and that ordering Defendant to get down on the ground and conducting a frisk was warranted.

When an individual is subject to a lawful investigative detention, an officer may conduct a limited frisk or pat-down of that person for weapons if the officer has reasonable suspicion of criminal activity and a reasonable belief that the suspect he is investigating at close range is armed and dangerous. Terry, 392 U.S. at 26-27; United States v. Walker, 181 F.3d 774, 778 (6th Cir. 1999). "[T]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent [officer under] the circumstances would be warranted in the belief that his safety and that of others was in danger." Terry, 392 U.S. at 27; see also United States v. Thomas, No. 04-5872, 2005 WL 1869676, *2 (6th Cir. Aug. 3, 2005). In other words, "[t]he purpose of the search is not to discover evidence of a crime, but to allow the officer to pursue his investigation without fear of violence." United States v. Vite-Espinoza, 342 F.3d 462, 466 (6th Cir. 2003). In determining whether an officer's suspicion of danger and subsequent conduct are reasonable, "due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch' but to specific reasonable inferences which he is entitled to draw from the facts in light of his experience." Terry, 392 U.S. at 27.

As the Court found above, Defendant stated that he had a gun in his waistband as Defendant got on the ground. Defendant had been seized at that point, but had not yet been frisked. The officers had reasonable suspicion to perform a Terry stop before Defendant's statement, and once Defendant freely admitted that he had a gun, the officers had even greater justification to believe that Defendant was armed, dangerous, and should frisked. The Court also finds that the seizure was sufficiently limited in duration and Investigator Claiborne's frisk of Defendant was proper.

Defendant argues that any statements made by Defendant should also be suppressed. The court finds that Defendant's statement that he had a gun to have been completely voluntary on the part of Defendant. Furthermore, the seizure, search, and arrest of Defendant were constitutional, any Defendant was advised of his rights and signed a waiver of those rights. Therefore, any statements made by Defendant were constitutionally obtained.

## V. CONCLUSION

After carefully considering the evidence introduced during the course of the evidentiary hearing, and after reviewing the relevant legal authorities, it is clear that there is no basis to suppress any evidence seized in this case, or to suppress the statements made by Defendant. For the reasons set forth herein, it is **RECOMMENDED** that Defendant's Motions to Suppress Evidence [Doc. 45 and 55] be **DENIED**.[6]

Respectfully submitted,

    s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[6]Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see also Thomas v. Arn, 474 U.S. 140 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).